On behalf of the FDL Law Office and John Milloy, on behalf of the FDL Committee, Mr. Don Hoskinson. Good afternoon, Counsel. Good afternoon, Madam. May I proceed? You may, Mr. Milloy. Good afternoon, Your Honors. My name is John Millroy. I'm representing the appellant here, Mr. Craig Jennings. Mr. Millroy, could I ask you to stand in the center of the podium because of the microphone, please? The arguments are recorded and it would come out a little bit better if you were closer. Thank you. Thank you, Your Honor. I represent Mr. Craig Jennings in the case of Jennings v. Keller Hill, which is 209790 before this court. Our appeal is that of a jury verdict that was rendered on March 4, 2009 against Craig Jennings. We have two counts in the complaint that went to the jury, one of which sought reimbursement of fees that Craig paid for the U.S. Soccer Board, and the second one was for fees that Craig paid to support the action of Keller Hill in regard to a sexual harassment suit pending in North Carolina against Anson Dorrance, a North Carolina coach, and the University of North Carolina. The basis of both counts was restitution based on unjust enrichment. Unjust does not mean unlawful. Actually, what you focus on in unjust enrichment is the benefit to the defendant. That comes out of the part-of-the-pillow case in Illinois, excuse me, an appellate court case. When a person has been unjustly enriched at the expense of another, they should be required to make restitution. That comes from the Restatement of 1937, Section 1. The definition of what a person is enriched also comes from the Restatement, and it states that a person is enriched when he has received a benefit, and a person confers a benefit if he performs a beneficial service, satisfies a debt, or provides any other form that frees the defendant from expense. Counsel, why isn't evidence of Melissa's settlement relevant to the question of whether Debbie's retention of the benefit was unjust? Didn't Craig testify that he expected to be reimbursed from the proceeds paid by the university to either Debbie or Melissa? Well, he hoped to be. The case never got to trial. What he was looking for was a trial where he'd be awarded fees by the court after it was successful, Melissa or Debbie or both. Regarding the arbitration, when Debbie and Craig signed an agreement, what did that agreement say? The agreement said that they were both liable for the fees generated by Williams and Connolly in regard to the arbitration, Your Honor. And would that be a contract type of action? Did you plead any contract action? I did not, Your Honor. If there's a contract, equity remedies will not lie to you. Do you agree with that concept? Well, let's put it this way. You can only have one recovery. You can take your election and be elected to go under unjust enrichment instead of any sort of contract action. My understanding was that if you have a contract action, you're not entitled to it. You can file both, but if you have a contract action and a contract, then you're not entitled to equitable action. Interestingly enough, Your Honor, Mr. Hodgkinson, counsel for the defendant, attempted at the last minute to add a contract implied in fact in this case. I objected to that. I didn't ask for a continuance. But Judge Bongiorno, at the end of the plaintiff's case, struck that because he saw no evidence of a contract in the case. Thank you. Also, Your Honor, to further answer your question about the introduction of the settlement agreement, first off, Judge Culleton, who handled the case at first and really handled much of the case until the jury trial, once the $385,000 settlement came in for Melissa, Mr. Varchetto from Mulherrin-Rayfield, Varchetto attempted to come in on a turnover order and attach the settlement proceeds so that he could have satisfied he had something like a $40,000 bill still outstanding for their fees on the case in North Carolina. And Judge Culleton at that time stated that he denied the motion stating that there was no relationship between the two actions. And that appears in C-1095 where Judge Culleton denied that. Then why do you suppose Melissa, whose damages were much less than, is it Debbie? Why do you suppose, or yeah, Debbie Keller-Hill, why do you suppose Melissa's settlement was so much larger than Debbie's, who Debbie is the one who actually had the, sounds to me from the record, the more damages? So weren't attorneys fees taken into consideration in that settlement? No, I don't believe so, Your Honor. I did cite to Melissa Jennings' case out of the Fourth Circuit where it reversed the trial court in North Carolina and it had some language in there in regard to what she had gone through. She'd been forced to leave the school, there were death threats made to her. She had to finish her degree at Northern Illinois with North Carolina's blessing. She was subject to a campaign of harassment and sexual innuendo by this Anson Dorrance character. And I would say 385 was likely to tell you the truth as to what she went through and still goes through. And Debbie got $70,000. $70,000. I've always wondered why she got $70,000, especially when there's probably $200,000 on the table and she had the better case. We wanted to do some discovery into that. Nobody ever could come up with the settlement documents on that $70,000 settlement. We asked several times. Nothing ever came of it. There were some affidavits from the defendants, which I didn't put too much stock in. And in the meantime, the salient fact here is that Debbie Keller Hill married Chris Hill, who was an athlete in North Carolina and who was the godson of the athletic director in North Carolina. So anyway, Debbie Keller Hill wasn't even around when the settlement was entered. Chris Hill was the person that got the law firm for her to get the settlement done. Chris Hill? Chris Hill was her husband, yes. Now, did Barchetto testify at some point that the reason, the basis for your client's settlement being a little larger was because attorney's fees were taken into consideration? I don't know what Mr. Barchetto said. I can't remember, but it's certainly not true. Well, that was part of the record, though, counsel, wasn't it? Well, the settlement agreement itself, Your Honor, says this is for compensatory damages, and there's nothing in there about attorney's fees. And as the court well knows, normally, unless there's been a jury verdict in federal court, you don't usually get attorney's fees. So this was pure compensatory damages, Your Honor. All right. You also cite public policy concerns and rules with respect to excluding evidence of the settlement that Melissa had. But those public policy considerations and rules are usually applicable in tort cases. Why do you contend, and by what authority do you contend that they should be applicable here? I've seen a lot of cases, Your Honor, and I've never seen those distinctions made at all. Basically, the judge in this case, Judge Bongiorno, we had argued this February 26th of 2009 prior to trial. Then right before we were picking the jury, I also remade our motion of limiting on the basis that this settlement was irrelevant, highly prejudicial. And Judge Bongiorno let it in because he said that these things were relevant. I mean, excuse me, related to each other over our objection, of course. And I told him at the time, if they're related then, just like in a personal injury case like Your Honor's talking about, if one tortfeasor was settled out, you would not let the evidence of that into the case against the other tortfeasor, except for the basis of bias or prejudice or something like that, which is not a factor in this case. Indeed, you would not do that. And also, I always thought it was totally irrelevant whatsoever here under Rule 401. It's been adopted by the Illinois Supreme Court and Elias. I can see no relevancy whatsoever. Judge Culleton, I don't believe so either. In your second count against the Barchetto firm, where you sued, both Debbie and Melissa were in there, and if you're asking for compensation, the attorney firm was representing both. How would he ever know how much work went to Melissa, how much work went to Debbie? You'd have to keep both of those cases together and have a stipulation. Well, if we had been able to proceed against, well, we did, as Your Honor said, have a case against Mr. Barchetto, we entered all the billings into the evidence. I'm not talking about the case against Barchetto. I'm talking about Debbie's case being relevant, Melissa's case being relevant to Debbie's case. As far as the billing, Your Honor? Yeah, because there were more or less co-parties, co-plaintiffs in the case against the university, et cetera. That's correct, Your Honor. We were not asking for the entire amount of Barchetto's fees. We had already paid quite a bit in excess of 50%. That's why we went after Barchetto, because we were already over the 50%. We paid $130,000 to $40,000 at that stage with about another $40,000 due in Owing. How do you prove to the jury the separation of fees, the part of the work that Barchetto did for Debbie and the part that they did for Melissa? Well, we just asked in our complaint, Your Honor, for it to be equally divided under basic contribution principles. So if the testimony were, in fact, by Barchetto that the settlement that Melissa received was larger because attorney's fees were taken into consideration, you still believe that the amount that she received would not be relevant to attorney's fees? No. Excuse me, Your Honor. Mr. Barchetto had absolutely nothing to do with the case. The settlement came at least a year or two after Mr. Barchetto had anything to do with the case. And obviously he thought that Melissa did not have much of a case. But I guess he was a little wrong, because he was about at least $300,000 off when Mr. Conicek handled the matter. So I don't know why Mr. Barchetto dropped out of the case. He complained of conflict. He may have had one. But indeed, Mr. Conicek brought it in for quite a bit higher than the $185,000 that was on the table for both women. Let's talk for a minute about the jury instructions and a couple of your contentions with regard to the jury instructions. In your opening brief, you say that the defendant didn't tender an instruction on burden of proof, and therefore that was error, the failure to give an instruction on the burden of proof, and yet the record does show that the court gave that instruction. So is that something you want to change now? I don't know how that would have been an error, Your Honor, because what I said was what was tendered, I think it was 9 and 10, were separate ones for separate counts here, that was tendered by the defendant. Basically, they didn't show the burden of proof on restitution and how you're going to determine it. It did have a blank, you know, a form, burden of proof instruction that was separate, I believe, from this instruction. But the problem we had with this instruction was a hybrid. It had preemptory aspects to it. It did not define unjust enrichment, but it said it was going to define it, or the judge was, and other instructions, and that was never done. The jury never had a definition here to work with on this case as to what restitution or unjust enrichment is or how it's supposed to be determined. But now your proffered instructions on unjust enrichment are pretty much the same as the ones that the court gave, aren't they? I don't think so, Your Honor. We tendered one. I looked quite a bit before we had this case. I knew there was no IPIs on it. We alerted Judge Bongiorno approximately a month before the trial. Both parties said that we're going to have to be careful about this because we don't have any instructions in Illinois. So Judge Bongiorno was on notice of the situation at least a month before trial. We had tendered what I thought, from what I'd seen and read a lot off of most of the jurisdictions in the U.S. From Idaho, all places came down with an instruction that I thought was pretty good. And also later on, Mr. Mann added an instruction that was from Midcoast Aviation, which, applying Illinois law, was very similar to the Idaho instruction. So, indeed, I think it's quite a bit different. I thought that the instruction tendered by the defendant was inadequate. It wouldn't tell you anything. Well, what information did the jury lack here? Well, for example, Your Honor, if I may have referred to the Idaho instruction, it sets out succinctly what a jury must determine. And it states, even though there's no agreement between the parties, which is something you have to consider, you know, in a restitution case, under certain circumstances where a party has been unjustly enriched by the actions of another, the law will require that party to compensate the other for unjust gain. Then it says, to recover under this theory, the plaintiff has the burden of showing the following. The plaintiff provided the benefit to the defendant. The defendant accepted the benefit. And under the circumstances, it would be unjust for the defendant to retain the benefit without compensating the plaintiff for its values. And it lays out exactly what the jury would have to determine, in other words, to award us anything. It follows a restatement, mid-coast, part of pillow, all the Illinois cases also. And under the Zork, the Zork case that we cite in our brief, the court, when faced with a situation where there are no IPIs, the court are cautioned to take their time and make sure that there's something that goes in here that really talks about what the law is. And I don't think that was done here. I know it wasn't done here. I think your time is up. It is, counsel. Thank you. Could I hear something on the affirmative defenses? Sure. Sure. Oh, do you want to hear something or not? What are your positions on the affirmative defenses? Well, first off, they're not affirmative defenses. By my definition, to be an affirmative defense, it must, if proved, knock out the plaintiff's case. The affirmative defenses of the defendant here... You're talking about the instruction, the affirmative defense instruction. Right. Exactly. Right. I assumed that's what Aaron was talking about. Anyway, the affirmative defenses were Craig Jennings controlled Williams and Connolly. And, you know, we all know Williams and Connolly. I don't think anybody controls them very well. Also, with Craig, this is for the benefit of Craig. That's irrelevant under this. If he's benefited the plaintiff, excuse me, the defendant is the only thing that matters. Whether the defendant knows about it or not is not even a problem. Because you don't even have to have knowing acceptance under cartelism to have it done. It's just whether it's just for the person that's seeking compensation or recompense, whether it's just for them to be paid back. You'll have time on rebuttal. Thank you, Your Honor. Thank you. Mr. Hodgkinson. Thank you. Good afternoon. My name is Don Hodgkinson, and I'm here on behalf of the appellee, Debbie Callaway-Hill. Mr. Hodgkinson, before you get started, since he left off with that instruction of affirmative defense, can you start on that? Sure. How is it that you report? I don't know if you were the trial lawyer on this case, but that instruction, doesn't it go a little bit above and beyond an affirmative defense? Well, the instruction itself, what it does is it does list all the affirmative defenses that the judge thought, in fact, there was enough evidence. As the Villa case says, all you have to do is have some support to that affirmative defense. The judge obviously felt that. He, in fact, struck a couple affirmative defenses that had been tendered to him prior to that. In addition to the affirmative defenses, remember that the affirmative defenses had been pled very early on in the case that the appellant had filed a motion to strike the affirmative defenses, that a hearing was held on that motion, that some affirmative defenses were struck from the initial answer in affirmative defenses, and it's important to note that the defense of Latchey's was included in the original affirmative defense response and was discussed in motions prior to or before trial, and so there had been quite a bit of vetting of the affirmative defenses. So by the time we got to the trial and the jury instructions, there had been a clean-out of many of the affirmative defenses, and the trial judge has discretion in regards to what he will allow as far as instructions go. Thank you. I would like to go, if you want to talk about your responses or your questions regarding the settlement agreement to Debbie Keller Hill. Yes, in fact, Lou Barchetto did testify, not that Melissa's settlement was due to an attorney's fees. He had testified that very early on in the case, he informed the appellant that in federal civil rights cases, that the majority of the damages are going to be in the form based on the amount of attorney's fees that were paid in that particular case, and that's in the record on 1866. It's also important to note that the appellant himself testified, as you noted, this is in the record on 1990, that he expected to get reimbursed from the university for his fees as part of any settlement or judgment. And lastly, as pointed out in my brief, paragraph 40 of his own complaint stated, this is his amended complaint, so his original complaint and the amended complaint said that the resolution of his daughter's case would provide reimbursement for his attorney's fees. So when you talk about is Melissa's settlement agreement relevant, it certainly is relevant because the appellant said when Melissa's case gets resolved, and the word was resolution, it wasn't trial, it was resolution, so resolution can include a settlement, that he would get reimbursement for his fees, and that was an important aspect that needed to be conveyed to the jury that he had got his fees, and he got it when Melissa settled the case. Do you believe that one of the basis for Melissa's fees, for Melissa's award, if you will, was based upon the fact that you had Debbie Hill kind of in the case as well, and Melissa kind of tagging along with Debbie Hill? Absolutely. Debbie Keller Hill, as Lou Bartel testified, pizzazzed to the case. Debbie Keller Hill was a college player of the year. Debbie Keller Hill was an All-American for four years. Debbie Keller Hill was a member of the United States national team that included Mia Hamm, Christine Lilly, Brandi Chastain. And by joining this case, you had, against which everybody agreed, a creep, Anson Dorans, and that she was bringing credibility to the case and credibility to the argument. And she had to give up a lot. The appellant is claiming unjust enrichment, and the key words are, was she unjustly enriched? She gave up a lot. She gave up an awful lot. And in my closing arguments, I mentioned the soccer ball that I had purchased at an auction. There it is. It's signed by all the members of the 2003 World Cup team. And the 1999 World Cup team was the famous one where Brandi Chastain scored the goal in the shootout and whipped off her shirt. And everybody knows, every red-blooded American male knows that. There were 80,000 fans in the stadium in Los Angeles on that day when that game took place. Debbie Keller Hill would have been on that team, but for the fact that she agreed with Craig Jennings' crusade against Anson Dorans, and she was willing to give up her opportunity to remain on that team. Remember, Debbie Keller Hill, the year before 1999, was the second-leading scorer on that U.S. national team behind Mia Hammond. So, when you claim unjust enrichment, you have to prove, as I believe the proper instruction was given, which was taken from the HPI case, an Illinois Supreme Court case, that he would have to prove that she unjustly retained the benefit to the plaintiff's detriment. When she accepted and settled for $70,000, she didn't retain that benefit to his detriment. Craig Jennings' case was improved by Debbie Keller Hill joining that case. And remember the fact that he testified that most of his communication with Debbie was through Debbie's mother. And he relayed to Debbie's mother that, please ask Debbie if she'll join the case. I will pay all the attorney's fees. Debbie, Judy Keller testified. She relayed that to Debbie. It took Debbie three weeks to determine, to decide what she wanted to do. And they knew full well that Debbie did, and her mother Judy knew full well that by joining this case, that they would have an effect on her membership on the U.S. national team. I think that was discussed in effect within ten days of joining the case, of the case being filed in Mr. Varchetto's billing records, that Judy Keller came and talked to Mr. Varchetto exactly about the possibility of Debbie not being on, no longer continuing on the national team. So that was out there. Debbie made that conscious decision. But by joining the case, she gave up a lot. And any monies that she had made may have been retained or not unjust. She brought, again, pizzazz to Mr. Jennings' case. Here's the problem. I'm going to go directly to your affirmative defenses because your affirmative defenses to me cause some problems. Namely, do you agree this is an equitable action? I agree that it's an equitable action, correct. One of your affirmative defenses is Latches. Tell me how Latches would apply and what you mean by Latches. Well, Latches is the defense, obviously. It's similar in nature to a statute of limitations. But in a case where he had, in this case, in an equity case, it's... Latches can be associated with time. Well, it can be associated with time. It is much broader than the fact... What do you mean? Okay. In this particular instance, Debbie Keller settled her case in March, I believe, of 2004. And in that particular instance, although he didn't know about it immediately, there was a payoff sometime thereafter. From the University of North Carolina. If Mr. Jennings felt, and he had his own attorney because his case was still alive, so that process was taking place. The settlement of Debbie's case was taking place during a time when he was represented by counsel in the exact same case. So he would have known about the timing of that. If he felt he was entitled to reimbursement at that point in time, certainly he had time to file a motion of some sort to the court in North Carolina saying, Wait, before you pay Debbie Keller, I need to get reimbursed because I have paid a lot of money in the process in this case. You mentioned earlier, too, in regards to the billing, it's important to note that Mr. Bracero testified that he never separated out the billing. That Mr. Jennings never asked him to separate the billing. It was all one bill. He never billed the girls. That he never sent Debbie Keller a bill. That all the bills went to Craig and he paid them. And so when you talk about that, he had the opportunity before that payout went to go to step in and ask for North Carolina. And that would be the typical third party unjust enrichment issue where she's getting paid from a third party. Debbie dismissed Bracero and hired a new attorney. And very shortly after she hired the new attorney, the case was settled and a payment was made. And at some point down the line, the plaintiff found out, learned about it. Well, again, as I stated earlier, he had counsel in that case during the time that Debbie Keller was settling the case. Notices had to go to him of what was taking place. What's your time limit, if you want to define it by the way of time? Because you're talking about time. He failed to do something when he knew he had knowledge of a fail. What time period are you talking about? Well, I say in this particular instance that he had the opportunity to get those funds right then and there. So he had a short time. It was a shorter time in order to obtain. When did he file the suit? He didn't file the suit until after Melissa's case was first dismissed on summary judgment. That occurred in October of 04. And he filed the suit in January of 05. And my belief in the defense of latches is that he should have gone ahead and made that application immediately to North Carolina in that instant case. When he was participating, he had counsel to say, wait, before you pay any money to Debbie Keller, I need to be included in that. Wasn't there an agreement signed by O.T. and Debbie regarding the restitution case? You mean the arbitration case? The arbitration case. The arbitration case. Yes, there was. That was an agreement with Williams & Connolly, and it was a co-obligor type of deal. There was no written agreement between Debbie and Mr. Jennings regarding that they would reimburse each other for that. It was simply an agreement to Williams & Connolly that both of them would be obligated to pay Williams & Connolly. And Mr. Jennings paid those fees. There's no question about that. And, again, there is some question as to whether Debbie, I believe the testimony is clear, that Debbie didn't want to participate. There was some reluctance in our evidence packet. There was a letter from Williams & Connolly to Mr. Jennings. The latches applied to the restitution case. Well, certainly I believe that would tie me to the Williams & Connolly case. Certainly, because that case was settled in 1999. That was determined in 1999. And here he filed this action in 2005. So if it was a normal contract, statute of limitations would have wiped it out. The next one is sums paid to Williams & Connolly were paid pursuant to Craig's individual obligation in debt to Williams. And by that, do you mean that there was a contract action? Williams & Connolly would have had a contract action against both Debbie and against Mr. Jennings based on the agreement that they both signed. Well, isn't the statement misleading that Craig Jennings and Debbie should have paid not just Craig Jennings? I suppose that you might say that it would be misleading. I will add in this particular instance that counsel for the appellant never produced his own jury instructions in regards to affirmative defenses. And I think he points out that he... Well, why wouldn't he provide the instructions for the affirmative defenses? Well, he may want to address exactly that issue that you talked about, that maybe it's misleading. And he would have changed it to include Debbie in that affirmative defense. He knew what the affirmative defenses are because he had already argued to knock some of them out in a... Doesn't he waive his right to argue that there are one is not really affirmative defenses if he goes ahead and files an instruction which answers those affirmative defenses? I believe he does. He waives that. And that would be in my notes here, which I'm confused. Yes, in fact, he does waive those under Aguina v. City of Chicago 243, ILF 3rd, that he... Failure to object to the instruction given, which I did believe he may have objected to them, and failure to tender a correct instruction results in waiving that particular issue. He does like Morse v. Harding, which says he prevented him from submitting an issue instruction, but that's really an incorrect interpretation of the case. The plaintiff in Morse submitted multiple proximate cause instructions, and the judge in Morse picked one of them. She didn't like it, and the appellate court simply said all she had to do was to object to her own instruction. And then she wouldn't be, you know, she could have that instruction. She would have the opportunity to argue her other instructions were appropriate. But he's arguing that the instruction, the affirmative defense instruction was preemptory. How do you respond to that? Did he affirm that the defense instruction was preemptory? I guess I would respond that he had the opportunity to present his affirmative defenses, and he chose not to do that. Was it clear anywhere? Was it there was no way to know whether the jury was misled by this instruction? Correct, correct. And Schultz, and that's important to remember, and Schultz says even if faulty instructions are given, the reviewing court will not ordinarily reverse the instructions unless it's obviously deceived the jury. And so I ask your honors if you believe, reviewing the whole record, that the jury was obviously deceived, and I don't believe that that was the case. Thank you. Well, I think the affirmative defenses to me seem like they're misleading because they refer to both Craig and Melissa as being liable, and they fail to mention that Debbie's not much different in position from the standpoint of receiving benefits than Melissa. Again, all I can say to address to that is the counsel had the opportunity. One, he fought them in a motion when we were arguing about pleadings, and we filed an amended answer and amended affirmative defenses. He had the opportunity to fight them then again if he wanted to, but he didn't. He never submitted an alternative. And he never submitted an alternative. Just this moment. Do you have anything else? No. Okay. Thank you, counsel. Thank you. Mr. Melroy. Thank you, Your Honor. In regard to the issue that was just being spoken of by Mr. Hodgkinson, in my original submission to Judge Bong's journal, I stated succinctly that with the nature of the issues instruction that was tendered by the defendant, if the judge honored any of those affirmative defenses, I would not be able to submit one. I put that directly out on February 6th of 2009, brought it up again on February 26th of 2009. I said, I can't good faith tender instruction on that. It's basically euphemism's jump. Okay? And if I did something like that, I think I'd be in a little trouble because I'd be honoring it. So that is your position, the fact that you didn't submit it, you did not forfeit that issue because you did it for it? That's correct, Your Honor. And I told the judge why we weren't doing it. Basically, it was a matter for discussion with the parties there. You know, this is wrong. We're going to have to do something with this or we have problems later on. So it was a trial strategy, basically, and the fact that you felt there was no affirmative defense, therefore you wouldn't tender it? No. If I did that, I think I'd be waiving, to tell you the truth. And speaking of the affirmative defenses, indeed, like Your Honor was talking about, the peremptory, it says, if Craig Gilliams is found to be controlling William McConnelly, so I don't know how he possibly could have been found to do that, or if he's done this for his own benefit, that Craig can't recover. All right. How do you answer this question? In general rule, if you have a general verdict, namely the issue of instructions and then affirmative defenses, how does an appellate court or a reviewing court go on what the jury relied upon in determining this verdict? Did they rely on the affirmative defenses or totally ignored them, as you described, as a bunch of folly? Well, that is a problem, Your Honor. That's for you. Yeah, well, what we're saying is the instructions here were so far out of whack, including the ones we've been talking about, we're also dealing with plain error here. The jury had no way of making a proper decision here. They had nothing regarding restitution or unjust enrichment, a definition. They had very confusing instructions, number 9 and 10, including the affirmative defenses, including the fact that there was a mention there was going to be a definition of unjust enrichment or the terms later on, and there never was, even though we asked for one. I mean, it's just so far gone. I don't see how any jury, given the fact that restitution or unjust enrichment, it's a fairly simple concept, but it's not easy for somebody like a juror off the street to understand it. So you need to, you know, the court needed to, and I stressed with the court that you're going to have to really sit down and do this so the jury can understand it. It never got done. So, and that's all I have to say about that. Anyway, also, Your Honor was talking about why the settlement document was, or whether the entrance of the settlement, not just the fact of the settlement, but the amount, which I consider two different errors. First off, it's prejudicial because it's basically stating that Craig Jennings is trying to get a double recovery here. There's no proof in this case that Craig Jennings got a nickel out of his daughter's settlement. Nobody entered any such evidence in. His daughter had an injustice done to her by the people of North Carolina, not by the people of North Carolina, but by Anson Dorrance, the pervert in North Carolina, and the University of North Carolina through their failure to do anything when she complained many times about her treatment. It's basically saying that Craig's trying to get a double recovery. He's trying to cheat the jury here. And, as a matter of fact, Mr. Hodgkinson's closing argument was basically based on this is a set-off. Craig had $405,000 in attorneys' fees for everything, and it should be set off by $385,000 by what his daughter Melissa got for compensatory damages in the case in North Carolina. That's extremely prejudicial. If, indeed, the judge later on figures it's a set-off, it shouldn't be done in front of the jury. It is not a set-off, but if the judge considered it to be, it should be done outside the presence of the jury. This is absolutely prejudicial. Also, it brings up the spectrum of double recovery, like I said. Also, count one, what did that have to do with the North Carolina action at all? Count one was for arbitration, and it had nothing to do with any compensatory damages that Melissa Jennings got in the North Carolina action. Count one was definitely for Debbie's benefit in arbitration. She got a tryout with the U.S. Soccer Federation because she brought that arbitration. She got free legal services from two very good firms from Craig. She obtained a settlement with North Carolina for $70,000. You know, Craig Jennings and his daughter have done a lot for our society here, and I think that Debbie Keller Hill could have, for example, when Mr. Varchetto came after him for $40,000 more, when she got a $70,000 settlement, maybe she could have helped out a little bit. She declined to do so. Well, who brought her into the suit? Who brought? Who brought her into the lawsuit? Who encouraged her to file the lawsuit? Well, she, okay, I'm glad you brought that up, Your Honor. Mr. Hodgkinson and Debbie Keller Hill would have us believe that she was brought in by a manipulative Craig Jennings, which is the farthest thing from the truth. The only thing I can say about Craig is he might be a little on the naive side here. The Keller Hills, excuse me, the Kellers and Debbie Keller had a long-running battle with Anson Durant in North Carolina. She missed the 1996 Olympics because she wouldn't come across Anson Durant, so he pulled her out and made sure she had surgery for a foot. So after that, the parents obviously were not very happy with him. In the summer and spring of 1998, he made a pass at her in a restaurant in North Carolina, and after that, the parents were inflamed. They were mad about Anson Durant in North Carolina before Craig ever approached them, as the correspondence we put into evidence in this case demonstrates. Group Exhibit 2, Exhibits 2-1, 2-2, 2-3 said that Debbie Keller Hill missed the 1996 Olympics because of the obstructiveness of Anson Durant. That was testimony that came in through these exhibits and also through her parents. I understand that, but had Mr. Williams not approached her, do you think she'd have filed a lawsuit?  I do know that Mr. Hodgkinson's firm was already involved in the matter because they were cc'd on some correspondence to Donna Lopiano in July of 2000. Excuse me, I'm getting ahead of myself. July of 2000, what year was it? 1998, excuse me. All right, do you have anything else, Justice Shepston? No, I'm good, thank you. All right, counsel, your time is up. The time has expired. Okay, thank you very much. To both of you, the court will take the matter under advisement and render a decision in due course. The court stands in brief recess.